UNITED STATES, Appellee

v

HENRY C. SELLERS, Captain, U. S. Army, Appellant

12 USCMA 262, 30 CMR 262

No. 14,499

Decided April 14, 1961

*First Lieutenant Richard A. Baenen* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

*First Lieutenant Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Richard G. Wittry.*

## Opinion

HOMER FERGUSON, Judge:

Tried by general court-martial, Captain Henry C. Sellers was found guilty of wrongful appropriation, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921; absence without leave, in violation of Code, supra, Article 86, 10 USC § 886; and failure to obey a lawful order, in violation of Code, supra, Article 92, 10 USC § 892. He was sentenced to dismissal from the service, forfeiture of all pay and allowances, and confinement at hard labor for six months. The con-

264

vening authority approved the sentence but suspended that portion which adjudged confinement. The board of review affirmed the findings, and we granted accused's petition for review upon numerous assignments of error. Those which have merit are more fully discussed below.

From the record, it appears that the accused was originally assigned to duty as a staff officer with the 1st Field Artillery Battalion, 28th Artillery. He was also given additional duty as Custodian of the Battalion's Consolidated Unit Fund. On November 17, 1959, Captain Sellers was reassigned by the battalion commander to a new position on the staff and to concurrent duty as a battery commander. In connection with his transfer, he was also relieved of his duty as fund custodian and directed to turn over the books and records to another officer. After he repeatedly failed to accomplish the transfer of the fund and its records to his successor, Captain Sellers was ordered by the Battalion Executive Officer, a Major Fye, to report with the necessary books and papers to his office at 8:00 a.m. on December 12, 1959. Major Fye's orders were issued as a result of instructions given to him by the Battalion Commander, Lieutenant Colonel Weyrick, to have Captain Sellers report to the commanding officer at the designated time with the records necessary to accomplish the fund's transfer. Major Fye's office adjoined that of Colonel Weyrick, but an order to report to the battalion commander did not necessarily involve presenting one's self to the executive officer.

The evidence further demonstrates that Captain Sellers did not report to Major Fye on the specified occasion. Rather, he absented without leave until December 18, 1959, on which date he voluntarily returned to his quarters. Upon the direction of a medical officer, he was immediately hospitalized.

On December 19, Major Fye instructed a Captain Pottorf to obtain the fund books and records "from Captain Sellers' car." At the time, Colonel Weyrick was absent from the battalion, and Major Fye was in command. However, he did not order Captain Pottorf to conduct a search. Rather, he instructed him to "contact Mrs. Sellers, to make sure she was at home, and to obtain her permission to go to the car and obtain the unit fund records." Captain Pottorf called Mrs. Sellers on the telephone. Thereafter, he proceeded to the Sellers' quarters and informed her that he had orders to obtain the records. Mrs. Sellers, utilizing a personal set of keys, unlocked her husband's automobile and permitted Captain Pottorf to remove the books and records from its rear seat. Mrs. Sellers did not believe she could "say anything" as Pottorf "said he had orders to pick them up."

An audit of the records thus obtained disclosed a shortage of $1,570.00 in Captain Sellers' accounts. Sellers was not informed of the result of the audit until he was notified of the charges which had been preferred against him. However, a few days after it was completed, he was visited in the hospital by the officer who succeeded him as custodian. At that time, he paid his successor the sum of $1,570.00 from funds which he had earlier deposited for safekeeping with the hospital treasurer. During its case in rebuttal, the Government produced evidence which tended to establish that accused's wife, on December 19th, received a transfer of funds from the United States in the amount of $2,000.00 and turned it over to her husband in the hospital on the same day. This sum consisted largely of twenty-dollar bills, the denomination subsequently utilized to pay accused's successor.

The accused also introduced evidence, including expert testimony, which tended to establish that he was suffering from amnesia at the time he absented himself without leave and disobeyed Major Fye's order. The Government adduced other proof which tended to rebut that defense, and the matter was ultimately submitted to the court-martial under proper instructions.

With the foregoing background established, we will proceed to consider the assigned errors. Where necessary, additional explanatory facts will be re-

lated as they are pertinent to the particular issue being discussed. However, there is a difference of opinion concerning the legal principles involved and their applicability to this case. Thus, except as noted by Judge Latimer in his separate opinion, the views expressed herein constitute only those of the author judge.

I

Accused initially argues that the law officer erred to his prejudice by permitting the Government to use the fund records and testimony based thereon to establish his guilt. His contention is that the records were obtained from his car by means of an unlawful search and seizure and that the evidence concerning their audit is no more than "fruit of the poisonous tree." Silverthorne Lumber Co. v United States, 251 US 385, 64 L ed 319, 40 S Ct 182. We disagree.

As the Government points out, the evidence does not demonstrate there was any search involved in this case. To the contrary, it conclusively establishes that both Major Fye and Captain Pottorf knew the precise location of the missing books and records and merely went to the accused's quarters to obtain them. Thus, the only question before us is whether the records were lawfully seized. That inquiry must also be resolved against the defense.

We need not involve ourselves in the issue whether a wife may lawfully consent to the seizure of property technically in her husband's possession. See Amos v United States, 255 US 313, 65 L ed 654, 41 S Ct 266 (1921), and United States v Derman, 66 F Supp 511 (SD NY) (1946). With regard to obtaining the return of its own property, the question which must be decided is simply whether the Government acted reasonably. United States v Bolling, 10 USCMA 82, 27 CMR 156; Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256 (1946).

In the *Davis* case, the Supreme Court found a search of the defendant's gas station and the seizure of gasoline ration coupons reasonable when it appeared that Government agents had observed gasoline sales being made without demand for coupons and thereafter had arrested Davis and required him to produce those coupons which he had on hand. In the course of its opinion, the Supreme Court determined that the ration coupons were Government property and remarked, at page 590:

". . . The distinction is between property to which the government is entitled to possession and property to which it is not. See 8 Wigmore, Evidence, 3d ed, § 2259c. The distinction has had important repercussions in the law, beyond that indicated by Wilson v United States (US) supra. For an owner of property who seeks to take it from one who is unlawfully in possession has long been recognized to have greater leeway than he would have but for his right to possession. . . .

"We do not suggest that officers seeking to reclaim government property may proceed lawlessly and subject to no restraints. . . . The nature of the coupons is important here merely as indicating that the officers did not exceed the permissible limits of persuasion in obtaining them."

Turning to the record before us, we find that Captain Sellers had, on several occasions, been directed to surrender the fund records. Finally, when ordered to appear with them, he disappeared for several days. When he was hospitalized on his return, Major Fye, the senior officer present at battalion headquarters, instructed Captain Pottorf to seize them from accused's car, but only under carefully circumscribed conditions. He was not to conduct a search and had to insure that Mrs. Sellers was present. The object of the seizure was not evidence of misconduct on Captain Sellers' part but the return to official control of Government records to which the United States was indisputably entitled. The entire process fairly shouts of the use of reasonable methods by the United States to regain its own property.

One other consideration merits attention. The accused had been ordered to produce the records but ▮▮▮▮ had not done so. There is no shield of privilege which can justify that refusal. United States v Haskins, 11 USCMA 365, 29 CMR 181; Wilson v United States, 221 US 361, 55 L ed 771, 31 S Ct 538 (1911); McPhaul v United States, 364 US 372, 5 L ed 2d 136, 81 S Ct 138 (1960). Production of records held in a representative capacity may be compelled even though their contents would incriminate the custodian. McPhaul v United States, supra. As Captain Sellers had failed to comply with the instructions he had received, it appears clear that the Government was entitled to use other reasonable means to obtain them. The ordinary judicial processes are unavailable to a commanding officer serving in a foreign clime, and it does not appear amiss to permit the substitute therefor of a military demand upon Mrs. Sellers for their production. The Government obtained no more than that to which it was entitled, i.e., possession of its own property, and it did so by means totally lacking coercive content. Compare Davis v United States, supra. What might have been done had Mrs. Sellers obdurately refused to permit entry into the car we need not now decide, although it is readily apparent that an authorized search might have been conducted to achieve the end desired. What is equally clear is that the Government's seizure of its own property through the authorized activities of Captain Pottorf was eminently reasonable and affords no basis for exclusion of the records and testimony concerning them. Davis v United States, supra; McPhaul v United States, supra; United States v Haskins, supra. Accordingly, the law officer did not err when he overruled the defense objections pertinent to this issue.

## II

The accused next complains of three instances on which the law officer is alleged to have permitted the Government erroneously to introduce evidence of his bad character. The first two occasions on which this occurred involve the same problem and may be discussed together. The third requires separate treatment.

In order to demonstrate motive on accused's part for the alleged larceny, the prosecution called evidence to establish that he frequently gambled at nearby officers' clubs; that his checking account was overdrawn; and that he had written bad checks totalling $149.00. Both the gambling and the negotiation of the checks constituted misconduct not included in the charges. However, proof of the incidents was ▮▮▮▮ admissible as tending to establish both a motive on accused's part to steal the funds entrusted to his care and the intent involved in the offenses of larceny and wrongful appropriation. United States v Haimson, 5 USCMA 208, 17 CMR 208; United States v Graham, 5 USCMA 265, 17 CMR 265. In my view, the error of the law officer, therefore, lies not in the admission of these items of proof, but, as the appellate defense counsel point out, in his failure to grant a requested instruction which would advise the court members of the limited purpose for which the evidence of other misconduct was received.

In United States v Bryant, 12 USCMA 111, 30 CMR 111, the Chief Judge, writing for a majority of the Court, adverted to our opinion in United States v Haimson, supra, and concluded that an appropriate limiting instruction must be given *sua sponte* when evidence of other misconduct was received. In so holding, he stated:

"Some cases in the Federal courts indicate that, absent a defense request, it is not prejudicial error to fail to give an instruction on the limited purpose for which evidence of offenses other than those charged is admitted. See Breese v United States, 203 Fed 824 (CA 4th Cir) (1913). In our opinion, however, the better rule is that the instruction is a necessary concomitant of such evidence."

The dissenting judge in that case based his disagreement only upon the necessity that the instruction be deliv-

ered *sua sponte*. In this case, no such variation in concept can arise, for defense counsel clearly and unmistakably requested the required advice. The failure of the law officer to grant that request was erroneous. United States v Bryant, supra; United States v Haimson, supra.

The third instance of which the accused complains commenced during defense counsel's examination of one of his own witnesses. Two witnesses were called to testify to accused's reputation for veracity. One, Major Bogard, was interrogated as follows:

"Q. Now, during this period were you in a position to form some conclusions concerning his character for truth and veracity?

"A. Yes. I had an ample opportunity to observe Captain Sellers and form an opinion as to his—

"Q. Have you reached a conclusion concerning his character?

"A. Captain Sellers is a superior officer as far as his work for me was concerned. He was a truthful officer.

"Q. You consider him truthful?

"A. Yes, I do.

"Q. Would you believe him under oath?

"A. Yes, I would."

The prosecution's cross-examination was limited to a single inquiry concerning the period of time during which the accused was Major Bogard's subordinate. One other witness was called and testified that he believed the accused to be "trustworthy" and that he also would believe him under oath. A two-hour recess followed.

When the court-martial was again called to order, defense counsel directed the law officer's attention to Major Bogard's answer concerning Captain Sellers' efficiency and asked that it be stricken as not responsive. Counsel expressly stated it was not his intention to place the accused's efficiency in issue. The law officer refused to strike the answer and, upon announcement by the trial counsel that he intended to rebut Major Bogard's testimony in this respect, informed defense counsel his motion came too late. Subsequently,

the prosecution was permitted to adduce, over defense objection, evidence of the accused's poor efficiency.

Evidence of an accused's bad character may not be shown by the Government unless it is first ▮▮▮▮▮ placed in issue by the defense. In such instances, the scope of the prosecution's rebuttal is limited by the extent to which the defense has inquired into the particular traits of the accused's character. Manual for Courts-Martial, United States, 1951, paragraph 138*f*; United States v Statham, 9 USCMA 200, 25 CMR 462.

In the present case, the defense placed in issue only the question of accused's reputation for truth ▮▮▮▮▮ and veracity. The examination of Major Bogard was obviously intended to elicit only information concerning Sellers' credibility, and the answer concerning his efficiency was clearly not responsive. While the defense counsel did not at once move the court to strike it on that ground, he did so immediately after a lengthy recess caused only by the failure of one of his witnesses to appear. He accompanied his motion with a request that the court members be instructed to disregard the testimony. I believe the law officer erred both in failing to strike the unresponsive answer and thereafter in permitting it to serve as a predicate for the introduction of testimony relating to the accused's inefficiency.

Every attorney and judge is aware of the tendency of some witnesses to go beyond the scope of the interrogatory placed to them and to trespass into an area concerning which testimony is not purposely sought. In such an instance, I am not disposed so narrowly to construe the prohibition against introduction of testimony that accused was a bad officer that a witness' undesired and unwarranted answer will be held to "open the door" to the prosecution. The defense counsel made an appropriate motion to eliminate the answer, and the members of the court-martial would normally be presumed to disregard its impact.

268

United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v O'Briski, 2 USCMA 361, 8 CMR 161. The situation is analogous to that in United States v Johnson, 11 USCMA 113, 28 CMR 337, wherein we refused to permit the Government to extend the scope of its cross-examination of an accused to cover a charge of unauthorized absence when he had initially limited his testimony to an offense of disobedience of certain orders but, on the stand, had ended it with a declaration that he went " 'over the hill again the next day.' " True, defense counsel might have moved immediately to strike the witness' testimony, but the fact that he delayed his request until after the recess in nowise harmed the Government. Under such circumstances, I cannot see how the lapse of time between the answer and the motion can justify the arbitrary refusal of the law officer to eliminate the unwanted material. Accordingly, I conclude it was error to deny the motion to strike it and thereafter to permit the Government to introduce proof of accused's poor efficiency.

### III

The only other assignment of error which warrants discussion is the allegation that the law officer also erred in refusing to grant three requested defense instructions or to substitute for them appropriate advices to the members of the court-martial.

The first instruction reads as follows:

"The mere failure on the part of a custodian to account for entrusted funds does not in and of itself constitute a larceny. Only if in addition there is a refusal or a knowing failure to account when demand is made or when an accounting is due may there be an inference that the custodian has wrongfully converted the property to his own use."

The law officer refused either to give the requested instruction or to substitute for it one which he deemed correct. Rather, he advised the members of the court in this respect:

"A withholding may arise either as the result of a failure to return account for or deliver property to its owner when a return, accounting, or delivery is due, or as a result of devoting property to a use not authorized by its owner; and this is so even though the owner has made no demand for the property and even though initially the property had come lawfully into the hands of the person thus withholding it."

In United States v Crowell, 9 USCMA 43, 25 CMR 305, this Court had occasion to comment upon the prejudicial nature of various instructions upon the effect of a failure of a custodian to account for funds entrusted to his care. Of the remark that "a failure to produce constitutes a stealing," we said at page 47:

". . . This advice had the effect of compounding the errors previously referred to on the question of presumptions. It was tantamount to advising the court that a failure to produce or deliver entrusted funds is equivalent to a larceny of the funds. *Under this theory once the Government has shown a failure to deliver or account, it has also proven a larceny for the two are indistinguishable. Such is not the law. The mere failure on the part of a custodian to account for entrusted funds does not in and of itself constitute a larceny. However, a refusal to account when demand is made or when an accounting is due will permit an inference that the custodian has wrongfully converted the property to his own use.* United States v Valencia, 1 USCMA 415, 4 CMR 7. Generally, in cases of embezzlement evidence as to the embezzlement act and the intent is inferential. Wharton, Criminal Law, 12th ed, § 1313. The intent may be manifested by various acts such as 'making false entries, denial of receipts of money, not accounting when it should be done, rendering false accounts, or practicing any form of deceit, or running away with the money, or actually expending the money for defendant's own uses contrary to his [owner] directions, or otherwise diverting the course of the money to

**269**

make it his own.' . . . [Citations omitted.]

"The inference which may be drawn from a custodian's failure to account for or deliver entrusted property at the time an accounting or delivery is required must be considered by the court, together with all the other facts and circumstances of the case, in determining the issue of an accused's guilt or innocence. *The court must adequately be informed, however, that such an inference is not mandatory and that it can be rejected or accepted as the court deems fit. This was not done in the case at bar and a failure to do so prejudiced the accused.*" [Emphasis supplied.]

From the foregoing, it will be seen that the first part of the requested defense instruction is a quotation of language from our *Crowell* opinion. The second part, however, modified our holding to indicate that conviction was possible only if certain additional factors were shown. The law officer conceded that the first part correctly stated the applicable law but refused to deliver the instruction unless defense counsel was also willing to use the precise language of our opinion in the second part. I am certain no such condition can properly be imposed and ▇▇▇▇▇ that, once a partially correct instruction is offered, it suffices to place the law officer on notice that the needful advice must be given. United States v Mason, 8 US CMA 329, 24 CMR 139; United States v Burden, 2 USCMA 547, 10 CMR 45; United States v Phillips, 3 USCMA 137, 11 CMR 137.

It is equally clear that, after the proposed instruction was tendered here, it was the duty of the law ▇▇▇▇▇ officer to advise the members of the court of the effect of a failure to account for funds entrusted to a custodian's care in the manner outlined in United States v Crowell, supra. The theory of the Government's case was built entirely around an apparent shortage in accused's accounts, his absence without leave, and his financial needs. To off-

set the adverse inferences which arose from these circumstances, the defense demonstrated that accused was not informed of the existence of a shortage until sometime after the audit and that, on demand, he immediately paid over in cash the amount due. Expert testimony established the possibility of amnesia as an explanation for his absence without leave. While there is other evidence which tends to explain the repayment as restitution rather than as an accounting and which opposes the presence of amnesia, there is a distinct conflict regarding whether an accounting was properly made. In such a state, it was imperative that the law officer, upon proper request, advise the court members of the effect of the purported failure to account and the inferences to be drawn from it and the other evidence in the case. United States v Crowell, supra.

Rather than do this, the law officer chose to inform the court members that a criminal withholding might arise merely from a failure to return or account for the monies involved, even though no demand had been made. This effectively controverted our holding in United States v Crowell, supra, by equating a failure to account or return to embezzlement. Under that advice, Captain Sellers would be guilty if he merely failed to redeliver the fund when he was ordered to appear before Major Fye, regardless of whether any shortage existed. As was noted in *Crowell*, supra, such is not the law. The proper rule is that an inference of conversion arises upon a refusal to return, account for, or redeliver property rather than the mere failure to do so. United States v Valencia, supra. It follows, in my opinion, that the law officer's refusal appropriately to advise the court-martial on the central issue of the accounting for funds entrusted to a custodian was prejudicial error.

In like manner, I conclude it was equally prejudicial to refuse to grant the second instruction requested by defense counsel. ▇▇▇▇▇ In essence, it informed the court-martial that it could not convict the accused if Captain Sellers had retained the amount of the record short-

age in his possession on behalf of the fund and surrendered it at the first opportunity. United States v Crowell, supra. United States v Pettiford, 27 CMR 617. This was but another aspect of the custodian's duty to account and, had a general instruction been given on that subject, perhaps specific reference to the matter would not have been necessary. Here, however, no such advice was included in the law officer's charge, and the failure to present this theory of the defense, fully supported by the record, was equally harmful.

Finally, the accused urges that it was erroneous to deny an instruction which required the court-martial to acquit the accused of disobedience unless it found that Major Fye had personally required him to appear at his office rather than having merely relayed Colonel Weyrick's instructions. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 574, and United States v Marsh, 3 USCMA 48, 11 CMR 48. The law officer properly denied the request.

There is not a scintilla of evidence in the record to support the proposition that Major Fye was simply relaying Colonel Weyrick's instructions to the accused. To the contrary, it appears that he threw the weight of his rank and position into the balance and added to Weyrick's order the additional requirement that the accused report to him before he saw the commanding officer. Thus, it is clear there was no evidentiary basis for the requested advice. Accordingly, it was properly rejected.

IV

Left for consideration is the question of the extent of prejudice involved in the errors present in this trial. We are at once met by the contention that accused could not have been harmed by any of them, for the evidence of his guilt is compelling. As noted in part above, I do not believe the proof in this record meets that high standard.

With respect to the offense of wrongful appropriation, there was evidence which permitted the inference that the accused had wrongfully converted the funds entrusted to his care. This may be drawn from his failure to report, as ordered, with the fund books, his absence without leave, the shortage reflected in the records, and his financial condition. On the other hand, there is proof that he surrendered the amount due the fund at the first opportunity after his return and expert testimony that his absence and the disobedience were both caused by an amnesic interlude. In light of this state of the proof, it can hardly be said that his right to have the court members fairly deliberate his guilt was not affected by the erroneous refusal of the law officer to give appropriate limiting instructions with regard to the evidence of other misconduct; the equally forbidden introduction of evidence of his poor efficiency; and the refusal properly to advise the court-martial of the issues before it. Accordingly, it is clear that accused's substantial rights were prejudiced.

Complete reversal, however, is not required. Accused prays only for relief with respect to the findings of guilty of wrongful appropriation and disobedience. His claim for the elimination of the latter finding is predicated solely upon the allegation of instructional error with respect to that charge. As we found the law officer's denial of that requested advice proper and as accused seeks no further relief, I would agree that we need set aside only the findings concerning wrongful appropriation and the sentence. United States v Bruner, 11 USCMA 658, 29 CMR 474; cf. United States v Olson, 11 USCMA 286, 29 CMR 102. For the reasons set forth in Judge Latimer's opinion, however, my brothers do not agree that reversal is required.

The decision of the board of review is affirmed.

LATIMER, Judge, with whom Chief Judge QUINN concurs:

I

With respect to Judge Ferguson's

well-written discussion in part I of his opinion, the Chief Judge and I are in full agreement. We join him in upholding the admissibility of the fund records and the testimony concerning them. Likewise we are in accord with the conclusion in part III of his opinion that the law officer did not err in denying the instruction requested by the defense pertinent to the offense of disobedience. From that point, however, we travel divergent paths, for the Chief Judge and I take a different view regarding the other issues, and are of the opinion that accused's conviction should be affirmed. In order to facilitate understanding by the reader, we will present our conclusions on the controverted questions in the same order utilized by Judge Ferguson in his opinion.

## II

Petitioner complains that the law officer permitted the prosecution to introduce evidence that he incurred losses in his frequent play of slot machines in one or more officers' clubs, and that a bank had returned checks drawn against his personal account for insufficient funds. These incidents, related as they were to the period of the shortage in the fund, tended to establish accused's need for money to make good his losses. Thus, proof of them was properly allowed to show motive by accused. See Wigmore, Evidence, 3d ed, § 215. It is asserted, however, that this testimony regarding gambling and negotiation of checks constituted proof of misconduct not included in the charges, and therefore that the law officer erred in failing to give a limiting instruction requested by the defense at trial. We are unable to subscribe to that view. In the first place there was no request for a limiting instruction on the check evidence and under our view of the law the law officer was not required to instruct thereon of his own accord. United States v Haimson, 5 USCMA 208, 17 CMR 208. Second, the instruction requested on gambling losses was patently erroneous.

However, there is more to this issue than those two deficiencies. The alleged offenses for which accused was prosecuted occurred in Germany, where this case was tried, and the record reflects that slot machines were authorized in open messes. Paragraph 14b, USARE UR Circular 230–60, March 12, 1959, Changes No. 1, July 21, 1959. Accordingly, we fail to perceive wherein the playing of slot machines in an open mess constituted misconduct. Nor are we persuaded that the evidence concerning the checks necessarily showed any wrongdoing by accused. It is clear that in order for the issuer of checks which are dishonored when presented to offend against the General Article, his conduct in failing to maintain a sufficient balance for payment upon presentment must be characterized by dishonor. See United States v Downard, 6 US CMA 538, 20 CMR 254; United States v Lightfoot, 7 USCMA 686, 23 CMR 150. Here, however, there was no such indication. For aught that appears, accused's actions may not even have been occasioned by simple negligence, and he may have picked up the checks as soon as he was notified by the Club that they had been returned by the bank. The mere fact that a check is presented to a bank at a time when there are insufficient funds on deposit to pay it does not constitute misconduct by the maker. The business world is not a utopia, and it happens in the course of commercial activity that responsible citizens and firms unwittingly or through excusable mistake, or fully intending that a covering deposit will be made, issue checks against insufficient funds. Surely without some showing of fraud, deceit, evasion, false promises, or other culpable circumstances, no one would contend accused's actions offend against the law. With the testimony limited to mere insufficient funds, and the questioned evidence being admissible on the merits, the law officer could, within his discretion, refuse to give any limiting instruction.

Lastly on this issue, the purpose in giving a limiting instruction is to avoid the possibility that a court-

martial would improperly use the evidence and convict the accused because the testimony shows he was a bad man and a person of that sort has a tendency to offend. To avoid that possibility, it is desirable to inform the court specifically that the testimony has limited use. However, in the case at bar, if we were to assume the evidence disclosed misconduct of some variety, it is apparent from other testimony in the record that the only reasonable inference the court-martial members would draw from the evidence was that the accused was living beyond his means and the money he failed to deposit was used for his personal benefit. As in other instances, the harmful effect of failing to give limiting instructions depends on the evidence and here, assuming the law officer should have been more liberal with the accused, his failure to narrow the effect of evidence bearing directly on guilt or innocence did not materially prejudice the accused.

The other item in this area about which accused complains on appeal concerns testimony regarding his efficiency. The matter was first broached in the course of the direct examination of a defense witness, Major Bogard, quoted in Judge Ferguson's opinion. Defense counsel did not request the law officer to strike the asserted unresponsive answer at that time but called another witness who testified with respect to accused's trustworthiness. When examination of that witness was complete, the defense announced it had yet another witness to call but that he would not be available until after lunch. Accordingly, the court-martial recessed at 10:48 a.m. and was not called to order until the afternoon session. It was at that juncture defense counsel for the first time apprised the law officer that "upon reflection" he realized an unresponsive and unintended answer had crept into the record, and asked that it be stricken from the record and the court instructed to disregard it.

In situations of this sort the law officer operates in a discretionary area, and unless it can be said his ruling was arbitrary and capricious, without any reasonable basis, it should not be over-turned. As we interpret the record, his ruling on the motion was not unreasonable. The question of efficiency was brought into the case upon direct examination of a defense witness, and regardless of whether the testimony had been elicited inadvertently through an unresponsive answer, it is crystal clear defense counsel did not express any concern at that point. Instead, he left testimony favorable to his client in the record, called yet another witness, and would have called a third but for the fact that he was not then present and available. It was only after examination of that second defense witness was completed and an additional period of nearly two and one-half hours had elapsed that defense counsel—in his own language, "upon reflection" — indicated anything but complete willingness that the answer stand. Certainly it is understandable that the defense would be happy to take advantage of evidence portraying accused in a favorable light. But equally it should not be surprising that the prosecution should attempt to refute that showing, and here it is apparent trial counsel had prepared to do just that during the recess, for he apprised the law officer of his intention in that regard immediately after the court-martial reconvened. Thus, while the law officer might have chosen to accede to defense counsel's request, it is also obvious that it would not be unfair for him to reason that the defense, whether it had intended to raise the issue initially or not, was willing to let the answer stand until defense counsel learned, during the recess, that the prosecution intended to offer rebuttal testimony, and only then and for that reason asked the law officer to act. As the Chief Judge remarked in United States v Wolfe, 8 USCMA 247, 24 CMR 57, criminal trials are not guessing games, and in our view there is nothing arbitrary or capricious about refusing to allow a party to gamble upon the retention of favorable testimony until such time as he discovers it will be rebutted and then ask it be taken from the court. Moreover, after a period of somewhat over two and one-half hours had elapsed, the law officer could conclude

reasonably that a curative instruction might not be so effective as if requested and given immediately. Last, as the board of review concluded, under the facts of this case no prejudice could arise from the testimony in rebuttal to the defense witness' statement that he considered accused to be a superior officer. Inefficiency does not tend to prove criminality, and that characteristic might supply a reason why the books and records were not kept properly. Moreover, had the motion been granted, accused would have been faced with the peculiar situation of rejecting favorable testimony. Had the issue not been brought in the open, reasonable court members might have inferred that the rebuttal evidence was much stronger than it turned out to be after cross-examination. Accordingly, there was no abuse of discretion by the law officer and hence no error in denying this defense motion and allowing the rebuttal testimony.

### III

The remaining matter which divides the Court concerns the law officer's refusal to grant certain requested defense instructions. As Judge Ferguson's opinion points out, the essence of one such instruction was that accused should not be convicted if he retained the amount of the shortage in his possession on behalf of the fund and surrendered it at the first opportunity. The Chief Judge and I cannot agree that the law officer erred in failing to so instruct, for the accused did not surrender any money at the time of his relief or within a reasonable time thereafter and the evidence compels a finding that he repaid his peculations from money obtained from the United States long after some of the abstraction. Significantly, this record shows clearly a classic case of larceny by embezzlement, for the accused assumed responsibility for the unit funds and violated his trust on numerous occasions by failing to deposit his receipts in accordance with prescribed procedures. In fact, once during the period in question, the fund's bank account was overdrawn. Also

274

during the same period, the evidence shows that he lost money playing slot machines; that he negotiated personal checks which were refused by the bank because of insufficient funds; that his personal checking account was overdrawn on one occasion but he almost immediately made a covering deposit; and that payments on a note securing his bank loan had fallen into arrears but he suddenly paid off not only the delinquent installment but the entire balance even before it came due. And, importantly, both of these personal obligations were satisfied at times when accused failed to deposit the fund's monies in accordance with his positive duty. Further, the following acts are entirely inconsistent with an innocent retention of the funds. Accused had been directed several times to accomplish a transfer to the new custodian but did not do so. After a lapse of considerable time, he was ordered to report with the appropriate records but instead he went absent without leave and took the books with him. Upon his return from his unauthorized absence, he was hospitalized and at that time he had no funds in his personal possession. It was at this time that the books of accounts were obtained and audited, and they reflected a substantial shortage. Then, ten days later, accused's wife received money from the United States, took it to accused in the hospital, and he subsequently turned over from that sum the amount of the shortage, giving it to the new custodian in exchange for a receipt. Thus it is clear beyond cavil that accused had neither surrendered the fund's monies at the first opportunity nor retained them in his possession on its behalf at all, but rather had made restitution after his return to military control out of money he received from an overseas bank while he was in the hospital. Accordingly, the law officer did not err in refusing to grant this requested instruction.

The remaining requested defense instruction requiring discussion is the following:

"The mere failure on the part of a custodian to account for entrusted funds does not in and of itself con-

stitute a larceny. Only if in addition there is a refusal or a knowing failure to account when demand is made or when an accounting is due may there be an inference that the custodian has wrongfully converted the property to his own use."

The answer to the question thereby presented is largely provided by the discussion immediately ▪ hereinabove. But, in addition, whether accused's post-audit payment brought the books in balance is academic for, if at the time the money came into his possession as custodian he converted any part of the proceeds to his own use with intent to deprive the Government temporarily of it, he is guilty of the offense of unlawful appropriation. The board of review touched on this aspect of the case when it stated:

". . . [O]ne who is a mere custodian of governmental funds, in this instance non-appropriated funds, is allowed little or no discretion as to how he will keep them. Certain fiduciaries, for example, an attorney in possession of money belonging to a client or certain corporate trustees or agents, may incur no criminal liability, *ipso facto,* because they may have mingled trust funds with their own, provided they are able to produce the proper amount upon demand. However, a custodian of public funds must keep his trust funds segregated from his own, and place them in authorized depositories, unless he is allowed to maintain a portion of the fund in cash. In the latter case he is expected to have the correct balance readily available at all times and in an identifiable form. He has no option to alter his position from a bare custodial agent to that of a debtor, nor is he at liberty to dodge an inspection of the funds in his possession because it might be inconvenient."

Restitution by the accused from funds he obtained from an overseas bank fully ten days after his return to a duty status, together with other evidence, raises some question as to his intent, but the court-martial resolved that issue in his favor by convicting him not of larceny but of the included offense of unlawful appropriation.

With regard to withholding and accounting, the law officer did properly instruct the court-martial that:

"A withholding may arise either as the result of a failure to return account for or deliver property to its owner when a return, accounting, or delivery is due, or as a result of devoting property to a use not authorized by its owner; and this is so even though the owner has made no demand for the property and even though initially the property had come lawfully into thehands [sic] of the person thus withholding it."

That charge does not offend against our holding in United States v Crowell, 9 USCMA 43, 25 CMR 305, and in our view it was adequate in light of the posture of the evidence in this case. The instruction covers a withholding under three different alternatives. It is conditioned upon (1) a failure to account when due, (2) failure to deliver property when required, or (3) a diversion of property to uses not authorized by the owner. From the overwhelming proof showing a continuous course of conduct by the accused which consisted of failing to bank all of the money coming into his hands, it is almost a certainty the court-martial relied upon the last theory. However, the other alternatives state the law properly and there is evidence to support a finding on either. By regulations, this accused was required to keep records showing the receipts and expenditures of all monies entrusted to him and to turn over the correct amount of money to his successor when he was transferred to his new position. Obviously he did not do that, for the records were not kept and the auditor determined the loss from a constructed account. Some of the shortages occurred as early as four months prior to the time the deficiency was ascertained, and up to the present time accused has never accounted for any of them as he merely paid the total shortage after the amount of loss was fixed with certainty. Many em-

bezzlers make good their peculations after they have been discovered, but that does not exculpate the offense. When there is a shortage in public funds, restitution may satisfy any civil liability, but it does not change the criminal responsibility. Neither does it constitute an accounting or delivery of property when due. Therefore, the court-martial was confined well within legal limits when it was permitted to infer a withholding from the various alternatives outlined by the law officer.

Accordingly, for the above-stated reasons, the Chief Judge and I find no error prejudicial to the substantial rights of accused. The decision of the board of review, therefore, must be affirmed.