UNITED STATES, Appellee

v

ROBERT L. TOBIN, Captain, U. S. Air Force, Appellant

17 USCMA 625, 38 CMR 423

No. 20,994

June 28, 1968

*Major Walter G. Fenerty* argued the cause for Appellant, Accused. With him on the brief was *Colonel Dwight R. Rowland.*

*Lieutenant Colonel Harry O. Hinz* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

FERGUSON, Judge:

Tried before a general court-martial convened at Keesler Air Force Base, Mississippi, by the Commander, Keesler Technical Training Center, the accused was found guilty of assault with a dangerous weapon, in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928; conduct unbecoming an officer and gentleman, in violation of Code, supra, Article 133, 10 USC § 933; communication of a threat and unlawfully carrying a concealed weapon, both in violation of Code, supra, Article 134, 10 USC § 934. He was sentenced to be dismissed from the service and to be restricted to the limits of Keesler Air Force Base for two months. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the following assignments of error:

1. THE LAW OFFICER UTILIZED AN INCORRECT STANDARD IN DECIDING AND INSTRUCTING UPON THE MOTION FOR A FINDING OF NOT GUILTY OF SPECIFICATION 2 OF CHARGE I AND THE SPECIFICATIONS OF CHARGES II AND III.

2. THE LAW OFFICER'S INSTRUCTIONS CONCERNING SPECIFICATION 2 OF CHARGE I WERE PREJUDICIALLY DEFICIENT.

3. WHETHER THE FAILURE TO INSTRUCT THE COURT MEMBERS TO DISREGARD EVIDENCE OF BREAKING INTO

**626**

THE VICTIM'S HOTEL ROOM WAS PREJUDICIAL AS TO THE FINDINGS AND SENTENCE.

## I

The accused, an Air Force Captain, was stationed at Keesler Air Force Base, Mississippi. In his off-duty time, he operated his own bar in Biloxi, Mississippi. Though she did not work there, Captain Tobin's wife frequently visited the bar and chatted with the customers. One of these was Donald R. Rigby, an Air Force civilian employee who was attending school at Keesler on temporary duty. According to the evidence on both sides, Rigby was suffering marital difficulties and frequently uttered threats against his wife and her paramour in Ohio.

While patronizing the bar, Rigby established a friendly relationship with Captain and Mrs. Tobin. She, in particular, sympathized with his difficulties and sought to calm his mental state. According to both Mrs. Tobin and Rigby, they talked frequently together at Tobin's bar and met at least twice by prearrangment at other establishments where they conversed and danced. On one occasion, Mrs. Tobin declared she had carried tranquilizers to Rigby in his room at the Biloxi Hotel, after she heard he was involved in an altercation outside Tobin's place of business. She also alleged that she visited him on the evening of May 27, 1967, but more of that anon.

According to Rigby, on the evening of May 27, he picked up a girl named Joyce and took her to his room at the Biloxi. While they were there together, accused knocked on the door and demanded admittance, declaring he knew Mrs. Tobin was with Rigby. Rigby denied this, asked accused to wait until he and Joyce could dress, and he would then be admitted to see for himself who was present. By that time, however, accused departed.

On the following morning, Rigby met accused in front of the Biloxi Hotel. Accused returned a pistol to Rigby and drove off, despite Rigby's attempts to talk with him.

In the evening hours of the same day, accused approached the desk clerk of the Biloxi Hotel and demanded the key to Rigby's room. He was wearing slacks and a sports-type shirt with the tail out. The clerk, George A. Smith, noticed a bulge under the shirt at accused's waistband. When he informed Tobin the key was not available, he was told to get a key and accompany accused. At the same time, accused raised his shirt, showed Smith the butt of a pistol, and said, " 'I'll give you some of this if you don't do this, what I ask you to do.' "

Smith conducted Captain Tobin to Rigby's room, opened the door with a passkey, and they entered. Rigby, forewarned of the impending visit, hid behind the door but was observed by accused as he and Smith turned to leave. Attributing canine ancestry to Rigby's maternal forebears, accused pulled his gun, at which time Rigby grappled with him and disarmed him. During the scuffle, the gun mechanism was operated, but the hammer fell on a fired shell. Its other chambers were fully loaded with live ammunition. After he was disarmed, accused left the hotel.

Rigby specifically denied any sexual relations with Mrs. Tobin. He declared she had attempted to advise him concerning his marital problems and their connection was purely on a friendly basis, as had been his relationship with her husband.

For the defense, Mrs. Tobin, now divorced from the accused, testified that, on the night of May 27, she visited Rigby in his hotel room, after having known him for about a month. She had been there once before to give him some tranquilizers, and her interest was solely directed toward helping him reach a rational solution of his marital problems. She had no relations with Rigby and "there was nothing to hide."

On the night of May 27, while she was visiting Rigby, her husband came to the hotel room and demanded admission. She would not let Rigby open the door "because I was concerned that Bob might misunderstand

the situation." She had previously given her husband cause to suspect her fidelity. Tobin finally left, when the door was not opened. On the following morning, he ordered her from their home.

Accused, testifying in his own behalf, declared he had become suspicious of his wife's relationship with Rigby. While attempting to find her on the evening of May 27, he went to the Biloxi Hotel, where he observed her parked automobile. Going to Rigby's room, he demanded admittance. Rigby opened the door partially, but the night latch remained chained. Rigby was unclothed and stated he would admit Tobin as soon as he dressed. Tobin heard his wife's voice in the room and, as Rigby continued to delay letting him in, he became disgusted and returned home, where he "got about as drunk as I have ever been in my life."

On the following morning, he ordered his wife from the house. Later, he found a pistol belonging to Rigby in her dresser drawer and drove to the Biloxi Hotel, where he returned it to its owner. After drinking that evening, he decided to return to the hotel and see Rigby in order to determine if anything could be done to save his, Tobin's, marriage. Knowing Rigby was now armed and being aware that he had previously used the weapon in an altercation, accused obtained his own pistol from his bar and proceeded to the hotel. To his knowledge, his pistol was not concealed by his shirt and "there was never any intention of covering it." He asked the desk clerk, Mr. Smith, to accompany him to Rigby's room, but neither threatened him nor pulled the weapon on him.

Smith and accused entered Rigby's room but, not seeing him at first, turned to leave. Tobin, however, observed Rigby step from behind the door, "And, in surprise at seeing him, I probably did reach for the gun, like this (indicated) and it was about the time he saw this that I saw him—he started toward me—and I probably reached for the gun at the same time."

**628**

The two men grappled; the gun clicked on an empty shell; and accused turned it loose. Had it not stopped on the fired shell, accused declared "it would probably have at least taken a leg off him." Accused allowed Rigby to disarm him when "I saw he wasn't armed."

Accused admitted he "went over there with a gun, with certain knowledge it would be necessary under the circumstances . . . [j]ust for protection." However, he added that "if I had found my wife and he together I would probably have fired a short at both of them, or, if he had pulled a gun on me I would have probably done the same thing to him."

Rigby had never threatened accused and had tried to talk to him when he returned the pistol to him. Tobin nevertheless considered him to be capable of using the weapon as he had established by his previous conduct that he would do so.

Accused conceded he had been drinking on the day in question, but recalled his activities with clarity and specifically testified that his conduct was not due to intoxication. After the alleged assault on Rigby, he left the hotel.

II

The first issue before us inquires whether the law officer utilized a proper standard in denying a motion for findings of not guilty as to the offenses of carrying a concealed weapon, assaulting Rigby, and the same behavior set forth as conduct unbecoming an officer and gentleman. In ruling on the motion, the law officer made clear that "[w]e are not concerned with evidence beyond a reasonable doubt at this particular stage." Instead, he noted the standard which he applied in denying it, and that which the court should apply in determining whether to object and overturn his ruling, was as follows:

". . . If there is any substantial evidence before the court which, together with all justifiable inferences to be drawn therefrom, rea-

sonably tends to establish every essential element of these offenses, the motion should not be sustained."

Under this standard, there was no objection from any court member to the denial of the motions.

Appellate defense counsel assert this measure is erroneous. Declaring the law to be the same in the military and Federal courts, they argue for adoption of an interpretation of Rule 29, Federal Rules of Criminal Procedure, which would grant the motion whenever the evidence, together with all justifiable inferences to be drawn therefrom, is insufficient to convince one of guilt beyond a reasonable doubt. In support of this interpretation of the Federal rule is .cited Curley v United States, 160 F2d 229 (CA DC Cir) (1947). In addition, it is said to be the modern trend in other circuits. See for example, United States v Honeycutt, 311 F2d 660 (CA4th Cir) (1962); United States v Conti, 339 F2d 10 (CA6th Cir) (1964); and Wall v United States, 384 F2d 758 (CA10th Cir) (1967).

There has been no definitive interpretation of Rule 29 by the Supreme Court, but other cases construe it to mean the motion should be denied if the evidence meets the standard set out by the law officer. United States v Feinberg, 140 F2d 592 (CA2d Cir) (1944); Moore v United States, 375 F2d 877 (CA8th Cir) 1967).

· Whether there is any substance to the distinction sought to be drawn, i. e., whether the evidence ■■■■■■ ought to be sufficient to convince beyond a reasonable doubt or whether it should be substantial enough to tend reasonably to establish every element of the offenses charged, need not detain us. Suffice it to say that the procedural rule· which the law officer and court applied here is to be found in paragraph 71a of the Manual for Courts-Martial, United States, 1951: ·

". . . If there is any substan-
· ·tial evidence which,-together with

all proper inferences to be drawn therefrom and all applicable presumptions, reasonably tends to establish every essential element of an offense charged or included in any specification to which the motion is directed, the motion will not be granted."

If such be different from Rule 29, supra, it is nonetheless the standard adopted in the Manual, supra, for military courts. As it is a matter of procedure, and thus within the competence of the President to promulgate, and is neither inconsistent with the Code or Constitution, it has the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105. It has heretofore received the unanimous approval of this Court. United States v Toms, 3 USCMA 435, 12 CMR 191. As it has the force and effect of law, we are not free to substitute a different practice, even were we inclined to do so. United States v Smith, supra; United States v Villasenor, 6 USCMA 3, · 19 CMR 129. It follows, therefore, that the ˙law officer and court applied the correct standard in ruling on the motion, and the assignment of error is without merit.

III

In the second issue, the accused alleges the law officer's instructions were prejudicially deficient for a number of reasons.

First, it is urged that the law officer erred prejudicially in failing to instruct as to the effect of ■■■■■■ ■ intoxication on the specific intent to conceal the weapon involved in specification 2 of Charge I. We disagree. The record presents no issue of intoxication. Accused himself specifically stated that his consumption of alcoholic beverages had no effect on his actions and that he was aware of what he was doing. United States v Shaw, 13 USCMA 144, 32 CMR 144. In his words, he · did not "blame" his behavior on his drinking. We need not decide, therefore, whether the offense of carrying a concealed weapon re-˙quires a specific intent to conceal it.

But see United States v Thompson, 3 USCMA 620, 14 CMR 38.

Secondly, defense counsel urge the law officer erred in failing to instruct *sua sponte* on the affirmative defense of accidental concealment of the weapon. Again, the answer is found in the fact that there is no evidence in the record to place such in issue. Mr. Smith, the desk clerk, testified that he noticed a bulge under accused's shirt and that accused, concurrently with his alleged threat, raised the shirt and displayed the weapon. On the other hand, the accused testified the weapon was not concealed and, in any event, he did not intentionally conceal it. There is simply nothing to indicate that the accused, while doing a lawful act in a lawful manner, concealed his pistol upon his person. See United States v Redding, 14 USCMA 242, 34 CMR 22; United States v Flippen, 16 USCMA 622, 37 CMR 242. There was, therefore, no occasion for the law officer to instruct upon "accident." We note, however, that the law officer specifically advised the court it was necessary to find an intentional concealment in order to convict.

Thirdly, the defense urges an instruction was required to the effect that the pistol was not concealed if its presence was apparent to a person of normal intelligence and that further advice was required, limiting the court to consideration of proof that it was carried while concealed, to the exclusion of the later occasion on which accused drew it and openly sought to use it. As to the first matter, such is said to have been put in issue by the desk clerk's testimony he noticed a bulge under accused's shirt prior to the weapon's display. The second matter is said to arise from the fact the court might have found accused guilty of carrying a concealed weapon from the incontrovertible fact that he later used his pistol in allegedly assaulting Rigby.

Regarding the first assertion, there is not the slightest evidence that any-one did or could regard the "bulge" under accused's shirt as a pistol until the weapon came into view. The second contention is equally unsound, for we are at a loss to see how court members may be charged with convicting one of concealing a weapon by evidence of its open display. Whereas the defense refers to little or no evidence of concealment, we find from the record substantial support for such a conclusion, if the fact finders chose, as they apparently did, to believe the testimony of Mr. Smith. Perhaps more to the point, we note that the law officer required the court to find beyond a reasonable doubt:

"(a) That, at the time and place alleged, the accused unlawfully carried a .38 caliber pistol, as alleged, *concealed on his person;*

"(b) That the said .38 caliber pistol was a dangerous weapon; and

"(c) That under the circumstances the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces." [Emphasis supplied.]

In addition, the law officer carefully defined a dangerous weapon and, as we have noted, specifically told the court, "A weapon is concealed when it is carried by a person and intentionally covered or kept from sight."

In light of these instructions, we fail to perceive any risk that the court would have convicted accused on evidence that he openly displayed the gun or despite the fact that it might have been open to view.

Finally, we are urged to find error in the denial by the law officer of a requested instruction that, under Mississippi law, one may lawfully carry a concealed weapon if the bearer reasonably believes he needs it to protect himself. Such is said to be justified by the holding in Page v State, 99 Miss 72, 54 So 725 (1911). Whether

such be the law in Mississippi and whether the evidence in this record permits any inference that the accused had reasonable grounds to fear Rigby need not detain us. In United States v Thompson, supra, we expressly held carrying a concealed weapon to constitute conduct to the prejudice of good order and discipline, quite without regard to local law. Thus, we said, at page 623:

". . . For the foregoing reasons, and in view of widespread local legislation, the provisions of the present Manual, the lack of any real necessity for carrying a weapon concealed, the reduction in opportunities to commit crimes of violence when weapons are not present, the manner in which the rights of the individual are trampled on by one armed with a gun, and the knowledge of the means by which murders and robberies are accomplished, we have no hesitancy in concluding that the carrying of a concealed weapon is an offense which offends against the second subdivision of Article 134. If large numbers of servicemen were roaming the streets armed with concealed weapons, the civilian population would justly fear, regard with suspicion, and distrust them. If it were to become known that the military services did not consider stealth and furtiveness when they were coupled with the capabilities of hand weapons as being inimical to public welfare, there would be an impact on society which would reflect severely on the whole military system. Too often, in the past, have the weapons been used for sinister purposes and for the military to relax its vigilance would make it easier for those who live by violence to prosper. A limitation is not unconstitutional merely because it prohibits. Furthermore, there is no unnecessary curtailment of a substantial right in demanding that a person who is in possession of a dangerous weapon notify others by an open display of his armament that he is so armed."

We conclude, therefore, that the law officer properly denied instructions regarding Mississippi law concerning the carrying of concealed weapons.

## IV

Lastly, we are urged to find prejudicial error in the failure to instruct upon evidence of uncharged misconduct, said to consist of the unlawful entry into Rigby's hotel room immediately prior to the assault upon him. Contrary to the defense contention, however, we are unable to separate such entry from the subsequent assault on Rigby or the previous threat to Smith. It was obviously part and parcel of both charges, as the threat was made to gain entrance into the room and the entrance was gained in connection with the subsequent assault. With the evidence in such posture, it is clear no limiting instruction was required. United States v Sellers, 12 USCMA 262, 30 CMR 262. Indeed, one may well wonder whether the entry was considered to be criminal by anyone connected with the trial. Under the circumstances, there was certainly no fair risk of prejudice either as to the findings or sentence, and we accordingly find the assignment without merit. United States v Back, 13 USCMA 568, 33 CMR 100.

## V

In sum, then, we find the accused was fairly tried and the question of his guilt of the several charges properly submitted to the court-martial. Regrettably, accused chose to take the law into his own hands, but the day is gone, if it ever existed, when the rude bark of the pistol could be substituted for the divorce courts or serve as an effective deterrent to the supposed adulterer. The circumstances of this case may serve to cause other authorities to mitigate the severe termination herein put on the accused's otherwise honorable and lengthy career, but, finding no error, we are constrained to affirm his conviction.

**631**

The decision of the board of review is affirmed.

Judge KILDAY concurs.

Chief Judge QUINN concurs in the result.