UNITED STATES, Appellee

v

MAURICE M. BUTLER, Lance Corporal,
U. S. Marine Corps, Appellant

18 USCMA 495, 40 CMR 207

No. 21,786
August 15, 1969

*Bruce R. Harrison, Esquire,* and *Lieutenant Allen D. Black,* JAGC, USNR, argued the cause for Appellant, Accused.

*Captain William S. Foss,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Colonel C. R. Larouche,* USMC, and *Lieutenant Ray M. Druley,* JAGC, USNR.

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial convened in the Republic of Vietnam convicted the accused of the murder of a fellow Marine, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Three assignments of error are presented on this appeal.

In one of the assignments of error, the accused relies upon certain inaccuracies by trial counsel in reading into the record testimony taken at the Article 32 investigation; the witness had died between the investigation and trial. Appellate defense counsel concede that "[m]ost" of the variations were "inconsequential," but they contend the accused was prejudiced by one of the misreadings. The board of review considered the matter and concluded it presented no ground for reversal. We reach the same conclusion.

We have set out below material parts of the Article 32 testimony and the corresponding reading by trial counsel. For convenience, we have numbered the extracts. Paragraph 2 is the transmutation alleged to be prejudicial.

| Article 32 Testimony | Trial Counsel's Reading |
|---|---|
| 1. "Q. Do you remember talking to me yesterday and saying that BUTLER said something to this effect; 'ANDERSON lunged at me and I thought maybe he had a grenade or something in his pocket, I really didn't know. I didn't know what else to do, so, I shot him'. Do you remember saying something like that to me? | 1. "Question: Do you remember talking to me yesterday and saying that BUTLER said something to this effect, 'ANDERSON lunged at me and I thought maybe he had a grenade or something in his pocket. I really didn't know. I didn't know what else to do, so I shot him.' Do you remember saying something like that to me? |
| "A. Yes, sir. | "Answer: Yes, sir. |
| 2. "Q. Is that generally what you remember BUTLER saying as to how the shooting happened? | 2. "Question: Is that generally what you remember BUTLER saying about how the shooting happened? |
| "A. That's not the exact words, but it's general talking. When you set down in a group and talk, that's what it amounts too [sic]. | "Answer: That is not the exact words, but it is general talking. We sat down in a group and talked and that's what it amounts to. |
| 3. "Q. This generally is how BUTLER told you the shooting happened, is that correct? | 3. "Question: This is generally how BUTLER told you the shooting happened, is that correct? |
| "A. Yes, sir. | "Answer: Yes, sir. |
| "Q. When BUTLER told you these things, were you acting as an investigating officer, investigator for the MP's or anything of that sort? | "Question: When BUTLER told you these things, were you acting as an investigating officer, investigator for the MP's or anything of that sort? |
| "A. No, sir." | "Answer: No, sir." |

Appellate defense counsel contend that the testimony as it appears in the Article 32 transcript ▇ "tended to downplay the verbatim accuracy of the purported admission" by the accused, whereas the testimony as read by trial counsel implied that the witness "remembered the remark [made by the accused] precisely as part of a specific, clearly recalled conversation." We do not discern this difference in stress or consequence. The challenged misreading is directly related to the matter that came before and after; when read in context, it is manifest that the witness testified to the general tenor of the accused's admissions, not their verbatim text. We are certain that this reading mistake by trial counsel was as "inconsequential" as the others.

The accused's second assignment of error deals with the law officer's instructions before findings. At the beginning of trial, and again during an out-of-court hearing on these instructions, defense counsel represented that the accused admitted firing the shot that killed the victim, but he did so in self-defense. The court members were instructed on self-defense. Since they found the accused guilty of murder as charged, they patently resolved the issue against the accused. Before the board of review, the accused contended the law officer erred by failing to instruct separately on accident as an excuse for the homicide. That contention was rejected. On this appeal, the accused contends the law officer erred by failing to instruct on "justifiable homicide as distinguished from self-defense." The appellate contention is predicated upon the principle that a person authorized by law to detain another is not criminally responsible for the death of that person if death results from the use of reasonable force to prevent his escape. See United States v Evans, 17 USCMA 238, 243, 38 CMR 36.

For purposes of this appeal, we may assume that the victim could be lawfully detained under the ▇ circumstances and that the squad leader of the accused's squad acquiesced in the accused's decision to impose physical restraint upon the victim so as to require him legally to remain in the room in which the shooting occurred. The record of trial, however, demonstrates beyond all doubt that the accused shot the victim without any thought of perfecting or continuing the restraint. There was, therefore, no obligation upon the law officer to instruct on this theory of defense. United States v Tobin, 17 USCMA 625, 629–630, 38 CMR 423.

The victim was Private First Class David P. Anderson, a Marine. Two hours earlier he had left his unit without authority. He appeared at a Vietnam house at which the accused's squad had decided to bed down for the night. He had been drinking. He was dressed in a green T-shirt, utility trousers, and sneakers. Apparently, he had no weapon. The accused talked to Anderson outside the house. He asked Anderson why he was in the area and where he was going, but Anderson did not answer. The accused told Anderson to enter the house to talk to the squad leader.

Inside the house, Anderson indicated that he had left his fireteam at a place several hundred yards away and he wanted an escort from the squad to go with him to find his group. The men in the house were generally suspicious of Anderson. From his appearance and answers to their questions, they thought he might be associated with the Viet Cong. His request for an escort was rejected.

According to the accused, the squad leader "wouldn't let them go." He, thereupon, told Anderson that "he wasn't going to be able to leave" and he "may as well find a good place to lay down and get some sleep because he was going back with us in the morning." Anderson objected. At that point, the accused "glanced to the side" and Anderson struck him either in the face or on the side of the head. They grappled with each other and fell to the floor. The accused came up on top of Anderson and "had him by the eye." 

Other members of the squad separated the two. After glaring at each

**497**

other for a few moments, the accused obtained his rifle, while Anderson was questioned by the squad leader and another squad member. The latter testified that, as they talked to Anderson, the accused kept "interrupting."

Standing to Anderson's left rear, the accused held his rifle "pointed down about ANDERSON's knees." He told Anderson to take his hand out of his pocket. Anderson continued "answering" the "questions" put to him by the squad leader and the other squad member. Anderson then turned around to face the accused. Several witnesses testified to what happened next. None of the testimony suggests that Anderson made any effort to leave the room; in fact, in response to a direct question as to whether Anderson had "ever attempt[ed] to leave that room," the squad leader stated that he did not "think he made an attempt as far as turning around and starting to walk out." All the witnesses agree that Anderson faced the accused and engaged in conversation with him. Nothing in their testimony indicates an intention by Anderson to leave the room or any act by him that would support an inference that his conduct toward the accused was a prelude to departure. All agree that Anderson made a movement either toward the accused or "toward the weapon" in the accused's hand and almost immediately was shot by the accused.

The accused's own testimony demonstrates that he never contemplated that Anderson's action was motivated by a desire to escape from the room or that his own response to Anderson's action was calculated to prevent Anderson from leaving the room. The only explanation for the shooting offered by the accused was that he was concerned for his own safety, and his own reaction to Anderson's movement was only to prevent injury to himself. The following excerpts from his testimony are typical:

"Q. What kind of move did ANDERSON make toward you? Would you describe it?
"A. It was just a real quick lunge.

"Q. Were you at this time fearful?
"A. No, sir.

"Q. What did you think he was attempting to do?
"A. I don't know. Some kind of bodily harm, possibly my life.

"Q. Would you describe—what was your action? Was it a reaction or what?
"A. Yes, sir, that's what it was, a reflex. I didn't expect him to jump, so that's why I didn't have my rifle pointed at him. I had it pointed down. That's the same way I carry it in the field and at the same time he jumped I just pulled it up. I could have just shot him in the leg—it was just reflex.

. . . . .

"Q. When ANDERSON moved toward you, why did you shoot? Why didn't you hit him with your rifle?
"A. It was a reflex. I just reacted. I had a rifle in my hand and [sic] I carried it in the field. I just happened to react in that manner. I just brought the rifle up, and pointed it at him.

. . . . .

"Q. Say I was in a room with you and you had ten of your buddies with you and I jumped toward you, would you still use your rifle on me, would you still shoot me?
"A. Sir, it was just a reflex, I didn't do it intentionally. Regardless of who was behind me, he was facing me, sir, and I was the one that asked him to take his hand out of his pocket, and he still came toward me the second time, so I had to stop him before he took something out of his pocket and shot me. I couldn't take the chance. I value my life, sir.

. . . . .

"Q. You stated that you thought he was attempting to do you some kind of bodily harm, is that right?
"A. Yes, sir.

"Q. What did you think he was going to try to do to you?
"A. I didn't know, sir.

"Q. Did you have any idea?

"A. It was my life at stake.

"Q. Why did you think it was your life at stake?

"A. Because he stated he had something in his pocket.

.　.　.　.　.

"Q. Did ANDERSON ever come close enough to you to touch your rifle?

"A. He came close enough, but he didn't.

"Q. Did he swing at you?

"A. He just lunged. At the same time I pulled my rifle up and shot him. He didn't touch me, though.

.　.　.　.　.

"Q. Do you think if he had had a weapon he might have tried to use it to get out of the house?

"A. I couldn't say what he was going to do at the time.

"Q. You didn't think much when you saw him coming toward you, you just pulled up the rifle and shot.

"A. That's all it was, just a reflex as a result of his coming toward me after he said he had something in there. He was trying to get his hand out of his pocket when he came.

"Q. You thought the only way to protect yourself was to shoot the man, is that right?

"A. Before he shot me, sir, if he should have had a gun. I think—I didn't have time to think about what was going on because he came fast. When I asked him to take his hand out of his pocket I figured he would take it out, but when he said it was in there, well—

.　.　.　.　.

"Q. You did intend to shoot him, didn't you?

"A. I didn't have any intentions at the time, sir, until he forced himself at me. Before that I had no intentions. I just tried to protect myself.

"Q. Didn't you intend to shoot him when you pulled the rifle up and pulled the trigger?

"A. I didn't intend to pull the trigger.

"Q. You did pull the trigger didn't you?

"A. Yes, sir."

The third assignment of error deals with the instructions as to sentence. The accused contends the law officer erred to his prejudice by failing to include an instruction to the court members to disregard evidence of other misconduct. The board of review also considered this assignment of error, and concluded it did not justify reversal of the sentence. We agree.

Testifying in mitigation, the accused indicated he was the father of a child born about six months before the trial. In answer to questions by his counsel, he further indicated he had "made plans to get married prior to this event." The accused now contends that this testimony is evidence that he had committed the offenses of fornication and bastardy, and the law officer should have instructed the court members to disregard these acts in their deliberations on the sentence. The contention is advanced notwithstanding defense counsel had argued to the court members that, while the accused was subject to confinement at hard labor for life for the offense of which he was convicted, his "imprisonment [should] be minimized" because he was a father and intended groom, and that the law officer had so instructed the court members as to indicate these circumstances were matters of mitigation. Cf. United States v Krokoskia, 13 USCMA 371, 32 CMR 371.

Considering the nature of the offense, the fact that maximum punishment extended to a dis- ■ discharge and confinement for life, and that the sentence imposed by the court members included a bad-conduct discharge and confinement for five years, we are certain that the acts of alleged misconduct in issue did not influence the court members to adjudge a more severe punishment than they would

have adjudged had they been instructed to disregard the accused's testimony as to these matters. United States v Browder, 15 USCMA 466, 35 CMR 438.

The decision of the board of review is affirmed.

Judges FERGUSON and DARDEN concur.