UNITED STATES, Appellee

v

PAUL V. NEES, Master Sergeant, U. S. Air Force, Appellant

18 USCMA 29, 39 CMR 29

No. 21,100

November 22, 1968

*Captain John T. Dorman* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph E. Krysakowski, Colonel Dwight R. Rowland,* and *Major Walter G. Fenerty.*

*Major Donald B. Strickland* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of carnally knowing his adopted daughter, in violation of Uniform Code of Military Justice, Article 120, 10 USC § 920, and sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for two years, and reduction. The convening authority approved the sentence. The board of review modified the findings and reduced the period of confinement to one year. Otherwise, it affirmed. We granted accused's petition for review upon a number of issues, only one of which requires extended discussion.

The evidence need not be set forth in sordid detail. Suffice it to say that the accused and his wife adopted Miko, a Japanese orphan girl, in Japan. She testified that he engaged in the acts charged on various occasions. These allegations were made known to accused's wife and led to their temporary separation and Mrs. Nees' contemplation of legal proceedings to end their marriage. Mrs. Nees wrote her husband concerning the matter and, in response, received two letters which she eventually turned over to the authorities. At the trial, these letters were received in evidence over objection that they constituted confidential communications between husband and wife. The same contention is now made before us, with the argument that it was prejudicially erroneous to admit the letters in evidence. We agree, and reverse.

The first letter, written by accused and addressed to his wife, discusses a lien on the family car and the status

30

of its title. It then takes up his daughter's allegations against him; the possibility of her relationship with a boy friend; her physical condition and misbehavior with others; the fact that his wife had indicated her intention to support him, but, at the same time, was writing to the authorities in such a manner to make it "obvious that you never meant a word of what you said about us working things out together." Concluding he had once again been deceived by a woman, Nees wrote that "I'm going to give you all the ammunition you need to completely ruin all the years of my service career." He characterized his daughter's accusations as *"almost* completely correct," repeated that he was "completely guilty of any and all charges made against me for any offense that you, your lawyer, or any Court of Law, may wish to make against me."

Referring to his wife's selfish pride which must be satisfied, accused noted he had hoped they would be able to work things out, but that her letters to the authorities ended that. He asked her to "do as your conscious [sic] dictates . . . *And Let's Get This Over With."*

In a postscript, accused added that he was "completely guilty of any and every charge you wish to make, short of murder, so have at it—and satisfy your selfish pride."

In a second letter, written the following day, accused referred to the first epistle "in which I fully explained my position." He noted he had done a great deal of thinking; apologized for wronging his wife and daughter; and asked their forgiveness. He discussed his daughter's very real problems and hoped they could be solved. Again referring to his earlier missive; his wife's apparent desire for revenge and the fact that only he would be the loser, accused concluded:

". . . So now you may do as you wish, and I hope you give this letter some serious thought before you answer. As you said before, our whole future together depends on what you do now—So now the decision is yours."

The privilege surrounding confidential communications between husband and wife is of such long standing and so well established as to require little documentation. Wigmore, Evidence, 3d ed, § 2332, *et seq.*; McCormick, Handbook of the Law of Evidence, page 168 (1954); Manual for Courts-Martial, United States, 1951, paragraph 151b(2). As succinctly stated in the *Manual,* supra, at page 286, "The purpose of the privilege extended to communications between husband and wife . . . grows out of a recognition of the public advantage that accrues from encouraging free communication in such circumstances."

The Government contends, however, that the privilege is inapplicable, as the accused, in writing these letters to his wife, did not intend that they be treated in confidence. It quotes from them at length in an attempt to prove he expected his wife would communicate the contents to third parties; *i.e.,* to a "lawyer," or "Court of Law." Counsel for the appellant assert the letters are presumptively confidential unless the contrary is established.

In Wolfle v United States, 291 US 7, 14, 78 L Ed 617, 620, 54 S Ct 279 (1934), the Supreme Court set forth the rule as follows:

"Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged; but wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential it is not a privileged communication."

See also Blau v United States, 340 US 322, 95 L Ed 306,[1] 71 S Ct 301 (1951), wherein, citing *Wolfle* and Wigmore, supra, § 2336, the Court placed upon the Government the burden of overcoming the presumption of confidentiality.

What then of the nature of these communications and the circumstances

---

[1] The privilege of marital communications in Federal courts is annotated at 95 L Ed 309.

under which they were made? Were they such that we can, without hesitation, decide that the accused obviously did not intend them to be treated in confidence?

In Lanctot v State, 98 Wisc 136, 73 NW 575 (1897), the Supreme Court of Wisconsin held that a letter from a man to his wife is by its very nature a confidential communication—hence privileged. See also 58 Am Jur, Witnesses, § 392, and citations therein. And in Wolfle v United States, supra, the Court held a man's letter to his wife was not privileged only because he had dictated it to his stenographer. "Normally husband and wife may conveniently communicate without stenographic aid." *Wolfle,* supra, at page 16. The thread of reasoning running through these decisions is that the information sought to be introduced was obtained by reason of the marriage relation, and, but for the confidence growing out of it, would not have been known. Hence, it is privileged. See 58 Am Jur, supra, § 385, numerous citations at Footnote 9.

While the presence of a third person at the time the communication was made might be evidence that no confidentiality was intended (Wolfle v United States, supra; Pereira v United States, 347 US 1, 98 L Ed 435, 74 S Ct 358 (1954), both cited by the Government), the same view does not obtain for documents coming into possession of a third person through voluntary delivery by the addressee-spouse— otherwise the privilege could by collusion be practically nullified for written communications. As Wigmore states, "The privilege is intended to secure freedom from apprehension in the mind of the one desiring to communicate; it thus belongs to the *communicating* one." Wigmore, supra, § 2340, and Footnote 1. See also Annotation, 63 ALR 107, at page 126.

In the case at bar, the accused's wife had left him after sixteen years of a sometimes stormy marriage, and had instituted divorce proceedings. The catalyst for the separation was an argument between the accused and Miko over her having left a party next door and staying out late. When the accused left their residence, Miko told the wife that the accused had been "bothering" her. After some questioning as to specifics, Miko, at the direction of the wife, wrote in detail what had allegedly transpired. The purpose, according to both Miko and the wife, was so that the latter could show this document to her lawyer. Thereafter, the wife and Miko left the family residence in Florida and went to Texas. From there accused's wife wrote to him, and told him she had talked to a lawyer about the divorce, enclosing a copy of Miko's statement. In her letter to the accused, she wrote, " 'After you read this, I don't see how you can blame me for doing what I have done.' " The letters from the accused to his wife, in reply thereto, are the documents presently under consideration. After their receipt, and thinking that her husband needed and would benefit from a psychiatric examination, Mrs. Nees took a copy of Miko's statement to the authorities at Sheppard Air Force Base. At their request, she later forwarded the two letters from the accused.

These then are the circumstances under which the accused twice communicated with his wife by letter. We have briefly recounted their contents above and need not repeat them. Suffice it to say, they reveal a man distraught and embittered by what he believed to be his wife's perfidy, her lack of faith in him, and her willingness to accept the word of their adopted daughter. Despite his confession, in the first letter, to "any and every charge you wish to make, shor: of murder," he cautioned her in the second to give serious thought to the matter as "our whole future together depends on what you do now."

We do not believe these letters reflect the accused intended or expected his wife to reveal them to a third party. His wife testified that she did not get the impression that he wanted her to use them in a divorce action. "I thought he was trying to tell me some-

thing between the lines in that letter. I just felt like after I read it, he wasn't guilty but he wanted to just see if I would go ahead and do what he said. It was just like—what difference does it make—go ahead—I want to see how far you will go with this." While her understanding of her husband's intent is not controlling of the issue, it is entitled to a great deal of consideration in our weighing of the matter, for who would know better the workings of his mind than she who had shared his bed and board for sixteen years.

We hold, therefore, that the law officer erred in admitting into evidence the accused's letters to his wife. Since they were in the nature of a confession to the charged offenses, prejudice is apparent. Cf. Blau v United States, supra.

In view of our holding on this issue we need comment only briefly on the other assigned issues.

With regard to the admission into evidence of a letter from Mrs. Nees to the staff judge advocate to the special court-martial authority, Prosecution Exhibit 17, the Government agrees with the defense that the letter was not evidence of a prior inconsistent statement but merely cumulative of the evidence she gave at the time. Since it merely supported her testimony, counsel assert that its admission could not have prejudiced the accused. Alternatively, and without departing from its concession, the Government contends that we should adopt the view taken by the board of review that the letter was admissible as being inconsistent with her trial testimony and that the procedure used in introducing it, also complained of, was not prejudicial to the accused. Whether inconsistent or not, its admission was clearly not prejudicial to the accused. Mrs. Nees testified that at one point she believed her husband guilty and subsequently changed her mind. Whether she did so prior to writing to the staff judge advocate is of little importance in our view.

The standard utilized by the law officer in instructing the court on the defense motion for a finding of not guilty of the Charge and specification is the same as that approved by us in United States v Tobin, 17 USCMA 625, 38 CMR 423, and, hence, not erroneous.

Prejudicial error is alleged over the fact that the base staff judge advocate, who was the recipient of the letter from Mrs. Nees, referred to above, later conducted the post-trial clemency interview and reported thereon to the convening authority. He recommended no clemency. In his testimony at trial on the issue of whether the receipt of this letter established an attorney-client relationship between him and Mrs. Nees, the staff judge advocate said, of his position within the command, "I represent the good guys, I represent the Government—the prosecution."

While it might be argued, as does the Government, that the testimony of the staff judge advocate was "inartful," we reiterate what we said in United States v Coulter, 3 USCMA 657, 660, 14 CMR 75: "The accused's best chance for sentence reduction, within the courts-martial processes, comes in the initial review." When a clemency interview and report, with recommendations, is a part thereof, it should be conducted by a completely impartial person. In view of our reversal of this case on other grounds we need not decide the issue. We recommend, however, that in order to avoid a similar controversy in the future, any subsequent interviews be conducted by someone not previously involved in the case.

The final issue concerns the question of whether the accused was prejudiced by references to the fact that he exercised his right to the assistance of counsel. The Government acknowledges our prior decisions in this area but contends that we should hold either (1) waiver, or (2) that the instructions of the law officer to disregard the matter cured any possible error affecting a substantial right of the accused, or (3) that there was no prejudice in view of the overwhelming evidence of guilt.

We need not decide the question of prejudice, in view of our action above. Error, however, is clearly ▇ apparent. See United States v Workman, 15 USCMA 228, 35 CMR 200, and cases cited therein at page 234. In the event a retrial is held, the evidence should not be admitted.

The decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN concurs.