**UNITED STATES**

v.

**Wendall W. MILLER, 485–62–9462, Machinist's Mate First Class (E–6), U.S. Navy.**

**NMCM 96 00761.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 16 Nov. 1995.

Decided 18 June 1998.

LT Syed N. Ahmad, JAGC, USNR, Appellate Defense Counsel.

J. Byron Holcomb, Civilian Defense Counsel.

LT Russell J.E. Verby, JAGC, USNR, Appellate Government Counsel.

Maj Troy D. Taylor, USMC, Appellate Government Counsel.

Before OLIVER, Chief Judge, SEFTON, Senior Judge, and LEO, Appellate Military Judge.

OLIVER, Chief Judge:

A panel of officer members convicted the appellant, contrary to his pleas, of committing an indecent act with and committing an indecent assault upon a female under the age of 16, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1994) [hereinafter UCMJ]. The members sentenced him to confinement for 6 months, a dishonorable discharge, and reduction to the

lowest enlisted pay grade. The convening authority approved the sentence as adjudged.[1]

We have reviewed the record of trial, the appellant's nine assignments of error,[2] and the Government's response. We heard oral argument on the first three assignments of error. Because we find merit in the first assigned error, which we conclude entitles the appellant to a new trial, we will not discuss the other assignments of error.[3]

### FACTS

The appellant lived with his wife, his adopted 11–year–old daughter, CM, and their 9–year–old son in Government housing. CM's best friend, AW, was an 11–year–old neighbor girl. On Saturday, 17 September 1994, after playing Nintendo together, CM invited AW to spend the night at her home. The appellant, whose wife was working late that evening, gave his permission.

At some point during the evening, the appellant asked AW if she was a "light sleeper." She told him that she was such a very heavy sleeper that she could sleep through just about anything. About 2100 the two girls got ready for bed. After engaging in a pillow fight and tickling with the younger brother, innocent horseplay in which the appellant became involved, CM and AW got into their beds. CM testified that she did not fall asleep. Instead, she claimed she listened to music on the radio. After 30 minutes or so, AW started crying and told CM about a sexual assault that the appellant had just committed.

AW testified that, some time after falling asleep, a large man, whom she took to be the appellant, sat down on the side of her bed. He separated her legs and used his finger to assault her sexually. Repulsed but fearful, she pretended to be asleep and turned on her side. Her assailant then left the room. When AW was sure he was gone, she complained to CM of what her father had just done to her. AW insisted upon returning to her own home, where she immediately reported the assault to her older sister, her sister's friend, and her parents. The next day her mother reported the incident to the authorities.

---

1. This court ordered that the convening authority conduct a *DuBay* hearing; that hearing was completed on 17 March 1997. That hearing has no bearing on this opinion.

2. I. MM1 MILLER EXERCISED HIS RIGHT TO TERMINATE THE INTERVIEW WITH THE NCIS INVESTIGATOR UNTIL HE COULD SPEAK WITH AN ATTORNEY, AND THE EXERCISING OF THAT RIGHT WAS INTRODUCED INTO EVIDENCE.
   II. THE MILITARY JUDGE ERRED WHEN HE DENIED ACCESS TO THE INVESTIGATION OF JEREMIAH ELMER.
   III. THE EVIDENCE PRESENTED AT THE COURT–MARTIAL IS AND WAS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT THE FINDING [sic] OF GUILT BEYOND A REASONABLE DOUBT.
   IV. THE MILITARY JUDGE ERRED WHEN SHE DID NOT PERMIT EVIDENCE THAT THE [AW][SIC] MAY HAVE MADE UP THE ALLEGATION IN ORDER TO KEEP HER FAMILY TOGETHER.
   V. THE MILITARY JUDGE ERRED WHEN SHE PERMITTED THE TRIAL COUNSEL TO QUESTION WHETHER MM1 MILLER HAD ALSO ABUSED HIS DAUGHTER AND TO ARGUE THAT THE MEMBERS SHOULD CONVICT MM1 MILLER TO PROTECT HIS DAUGHTER.
   VI. THE MILITARY JUDGE ERRED WHEN SHE PERMITTED THE TRIAL COUNSEL TO ADMIT A NEGATIVE PERFORMANCE EVALUATION OF MM1 MILLER, WHERE MM1 MILLER HAD ONLY INTRODUCED CHARACTER EVIDENCE CONCERNING TRUTHFULNESS. (References and citation omitted.)
   VII. THE MILITARY JUDGE'S ERRONEOUS RULINGS CONSTITUTED CUMULATIVE ERROR. (Citation omitted.)
   VIII. THE SPECIFICATION OF INDECENT ACTS WITH A CHILD IS MULTIPLICIOUS WITH THE SPECIFICATION OF INDECENT ASSAULT, WHERE THE EXACT SAME CONDUCT WAS THE BASIS FOR BOTH OFFENSES AND INDECENT ACTS IS A LESSER-INCLUDED OFFENSE OF INDECENT ASSAULT. (References and citations omitted.)
   IX. THIS COURT, BY REQUIRING ONLY ONE JUDGE OF THE PANEL TO READ THE RECORD OF TRIAL BEFORE THE PANEL ISSUES A DECISION, VIOLATES ITS OBLIGATIONS UNDER ARTICLE 66, UNIFORM CODE OF MILITARY JUSTICE. (Citations omitted.)
   Because of our disposition of the case, we will only analyze the first and third assignments of error.

3. After applying the tests for legal and factual sufficiency our superior court articulated in *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A. 1987), we conclude that the third assignment of error is without merit.

Special Agent Bruce Rogers, Naval Criminal Investigative Service (NCIS), was the final witness the Government called in its case-in-chief. He testified that he was the lead investigator in the case, interviewed several witnesses, and viewed CM's bedroom 4 days after the incident. He also interviewed the appellant on that day. After being advised of his rights and the offense of which he was suspected of committing, the appellant denied asking AW if she were a light sleeper. He also denied that he touched her inappropriately. However, he admitted checking on the girls "two maybe three times" after they had gone to bed. The appellant explained he understood that AW left the house because she "wanted her privacy." Record at 195. The final portion of Special Agent Rogers' direct testimony proceeded as follows:

Q: Did he eventually terminate the interview?

A: He asked that it stop until he could get advice from legal counsel.

Q: Then he terminated the interview?

A: Yes.

Q: How long did the entire interview last, approximately?

A: I'd have to refer to the notes.

Q: Just the approximate.

A: From the time of his rights waiver to the end of the—this is off the top of my head. About a half hour or so.

Q: Not a very long interview?

A: No.

TC: That's all I have, Your Honor.

Record at 195–96.

At the next Article 39(a), UCMJ, 10 U.S.C. § 839(a) session, the defense team requested "a brief instruction to the members that they should not hold it against Petty Officer Miller that he invoked his right to counsel as was testified to by Special Agent Rogers." The military judge responded: "Do you want me to emphasize that? Are you sure you want me to do that?" Both of the defense counsel responded independently: "Yes, Your Honor." The assistant defense counsel observed: "I think that was clearly directed at the members and the members—I found

them taking notes immediately upon that statement." Record at 207.

The trial counsel then contributed the following: "We don't have to do it now. We could do it along with the instructions. It doesn't matter to me." The defense counsel agreed that they could "do it with the rest of the instructions." At this point the military judge stated: "Okay, then don't let me forget." *Id.* Later, the military judge did not propose or give any instruction on the matter; the appellant made no objection to the instructions, either as proposed or as given. Nor did he request any additional instructions. Record at 275, 283.

## DISCUSSION

The appellant contends that the military judge erred in failing to take adequate steps to remedy an obvious error during the trial: the introduction into evidence of his decision to terminate the interview with the NCIS until he could speak with an attorney. The Government agrees that such testimony would "normally" constitute error, even plain error. However, the Government's position is that, under the circumstances of this case, it was not so prejudicial as to entitle the appellant to relief. We disagree. We hold that the admission of the NCIS agent's testimony materially prejudiced the substantial rights of the appellant and that, because the military judge failed to take the necessary steps to remedy the prejudice, he is entitled to a new trial.

■ Our superior court has long recognized that when an accused is interrogated concerning an offense he is suspected of committing, his pretrial reliance upon his Article 31, UCMJ, 10 U.S.C. § 831 rights "may not be paraded before a court-martial in order that his guilt may be inferred from his refusal to comment on the charges against him." *United States v. Brooks,* 12 C.M.A. 423, 425–26, 31 C.M.R. 9, 11–12, 1961 WL 4509 (1961). *See United States v. Nees,* 18 C.M.A. 29, 33–34, 39 C.M.R. 29, 33–34, 1968 WL 5050 (1968); *see also* MIL.R.EVID. 301(f)(3), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).

This principle is founded upon the open-eyed realization that to many, even to

those who ought know better, the invocation by a suspect of his constitutional and statutory rights to silence and to counsel equates to a conclusion of guilt—that a truly innocent accused has nothing to hide. . . .

United States v. Moore, 1 M.J. 390, 391 (C.M.A.1976).

■ When the Government brings such inadmissible information to the attention of the members, the test for prejudice is the constitutional standard of harmless beyond a reasonable doubt. Id. at 391–92 (relying upon United States v. Ward, 1 M.J. 176, 180 (C.M.A.1975)); see U.S. CONST. amend. V; Chapman v. California, 386 U.S. 18, 21–22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Applying this standard, we must set aside the conviction unless our "examination of the record supports the conclusion that there is no reasonable possibility that the error might have contributed to the conviction." Moore, 1 M.J. at 392.

■ A recent case which focused on a similar problem is United States v. Riley, 47 M.J. 276 (1997). In Riley, our superior court found plain error in repeated references an NCIS agent made to the accused's invocation of his right to remain silent. Id. at 277. Both the appellant and the Government agree that, unless there are factual distinctions, the legal principles in Riley, which are largely founded upon Moore and the other authorities cited above, must govern the disposition of this case.[4]

The Government argues that there are important distinctions between Riley and this case. The NCIS agent in Riley was the first witness the Government called. He therefore became the "filter" through which the members viewed the rest of the evidence. In the instant case, the agent was the final witness the Government called. However, we see that as a distinction without a difference. One could equally well argue that the

members, having heard the testimony of the NCIS agent more recently, would give it more weight, and that it would be the "lens" through which they would examine the other evidence they had heard. There is every indication, in both Riley and this case, that the trial counsel made a concerted decision to elicit the agent's testimony so that it would have the maximum impact on the members.

Another distinction to which the Government points is that in Riley the NCIS agent had no other important admissible evidence concerning which he could testify. In the instant case, the NCIS agent testified about other relevant matters, including the appearance of the crime scene and several statements the appellant made before invoking his right to counsel. This could be a more important distinction, particularly if the agent had blurted out the inadmissible evidence. However, our superior court's central concern in emphasizing this point in Riley appears to be that the Government had called the NCIS agent to the stand for the purpose of introducing the inadmissible evidence. See Riley, 47 M.J. at 280. Our reading of the instant record, in which the trial counsel affirmatively elicited the circumstances under which the interview "terminated," was calculated to draw out the fact that the appellant had invoked his constitutional and statutory rights.[5] This was unacceptable.

Additionally, the Government notes that the special agent in Riley repeated the fact that the accused had invoked his right to remain silent three separate times. In the instant case, there was only one such overt reference. However, the trial counsel focused on the general topic for several questions, asking the circumstances under which the appellant "terminated" the interview. The trial counsel also got the witness to agree that it was "not a very long interview," clearly suggesting to the members that but

---

4. We recognize that the primary focus of the Riley opinion was on the question of "plain error" and on the interrelationship between Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). See Riley, 47 M.J. at 278–80. However, the fact patterns are quite similar. Unless we are able to adequately distinguish it, the holding is binding on us.

5. We note that the assistant defense counsel stated on the record that the testimony was "clearly directed at the members." Record at 207. Both the military judge and the trial counsel appear to have accepted this characterization by the lack of any contrary observation.

for the appellant's request to end the interrogation, it would have continued. *See* Record at 195–96. Moreover, the assistant defense counsel noted on the record his observation that as soon as the NCIS agent testified to that effect, the members took notes.[6] Record at 207.

Although the trial counsel did not specifically argue the appellant's invocation of his right to consult with counsel during her argument on findings, the trial counsel reminded the members that he had a chance to tell NCIS more of what he testified to during the court-martial. The trial counsel argued that his failure to do so should be held against him in evaluating his credibility.[7] *See* Record at 265–66. Whether the inadmissible evidence came before the members one time or several times, we conclude that very real damage was done.

The Government also notes that the only thing it had to rely on in *Riley* was the testimony of the complaining witness, whose testimony this court evaluated as wavering. *United States v. Riley*, 44 M.J. 671, 674 (N.M.Ct.Crim.App.1996), *rev'd on other grounds*, 47 M.J. 276 (1997). The Government argues that the instant case is far stronger. Although we have not reviewed the entire record in *Riley* such as to draw a valid comparison, the case against the appellant was also not without its weaknesses. The appellant, who put on a parade of unrebutted character witnesses, emphatically denied committing the offense. Moreover, AW, the Government's key witness, told different versions of her story prior to trial. The defense called several witnesses that she had a reputation for stretching the truth to draw

attention to herself. After reviewing the entire record, we are convinced that there was a "reasonable possibility" that this tainted evidence might have contributed to the members' decision to convict the appellant of these offenses when they might otherwise have acquitted him. *See Moore*, 1 M.J. at 392.

█ Finally, the Government contends that the appellant never objected to the instructions as proposed or given, thus waiving his earlier request for a curative instruction and forfeiting the issue on appeal. This is the strongest point in the Government's argument, but nonetheless not convincing.

The Government notes that the military judge, the trial counsel, and the defense team met in an "802 conference" to discuss findings instructions. Record at 275. *See* RULE FOR COURTS-MARTIAL 802, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.)[hereinafter R.C.M.]. This session took place less than 4 hours after the military judge had told the appellant's two counsel to "remind" her of the need for a curative instruction. The Government argues that it was during this session that the defense team *must have made a "tactical decision"* not to seek such an instruction because they did not want to remind the members of the tainted testimony. Answer on Behalf of the Government at 6–7.

This theory relies on conjecture and supposition; nothing on the record supports the argument that the appellant ever addressed the issue of waiving his earlier request for a curative instruction.[8] The military judge had

6. During oral argument, Government counsel suggested that there is no way we can be sure that this statement was true. However, we are persuaded that this near contemporaneous representation by an officer of the court, with which neither the trial counsel nor the military judge took issue, was an accurate statement that at least some of the members recorded this inadmissible statement of the NCIS agent.

7. The specific reference trial counsel made during her argument was to the appellant's testimony during trial that, as AW was walking past his room on her way out of the house, he was saying his evening prayers. She argued: " 'Ever tell NCIS that you were sitting on your bed saying your prayers.'? Give me a break. He's ly-

ing...." While nothing prevents the trial counsel from making fair comment on the credibility of any witness, including the accused, this argument (to which there was no objection) comes close to commenting on his decision not to tell his entire version of events to the NCIS prior to trial.

8. The military judge knew how to elicit an explicit waiver from the parties when she wanted to do so; she made reference to the issue of whether the parties wanted an instruction on the affirmative defense of voluntary intoxication. The defense counsel indicated that they did not want any such instruction and the military judge made the decision, on the record, that she would not

promised to give such an instruction. Record at 207. Although the military judge admonished the defense counsel not to let her forget the issue, it is not the appellant's obligation to do so. The military judge has the responsibility to manage the proceedings to ensure a fair trial. *See* R.C.M. 801(a)(5).

The military judge had the obligation either to give an instruction or to ensure that the record reflected an affirmative withdrawal of the appellant's earlier request.[9] She did neither. The failure to provide a curative instruction worked to the substantial prejudice of the appellant. Therefore, this first assignment of error has merit and entitles the appellant to appropriate relief.

## CONCLUSION

Accordingly, we set aside the findings and the sentence. An appropriate convening authority may order a rehearing.

Senior Judge SEFTON and Judge LEO concur.

---

give it. Record at 275. That is how the rules provide such decisions should be memorialized on the record. R.C.M. 802(b).

9. The trial counsel shares the responsibility to protect the record. The trial counsel should have ensured that any issues discussed during the R.C.M. 802 session were reflected on the record and all decisions made in open court. R.C.M. 802(b); *see* R.C.M. 802(a), Discussion.